IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO: 7:17-CV-90

| | |
|---|---|
| Miguel Lopez-Zarate, Ivan Ariel Baez-Quirazco, Jose Andres Barroso-Pacheco, Eliseo Cerna-Ramirez, Ignacio Clemente-Gutierrez, Martin Mario de los Santos del Rosario, Francisco Javier de los Santos Ramirez, Guilmain Evangelista-Alvarez, Adolfo Guerrero-Fernandez, Cesar Herrera-Velasquez, Fortunato Rayon-Flores, Flavio Rios-Santos, Juan Manuel Rodriguez-Magaña, Jorge Alberto Rojas-Castro, Felipe Ruiz-Rios, Sofronio Ruiz-Sanchez, David Zárate-Arrollo, Edray Moises Jimenez-Garcia, and Misael Jimenez-Garcia, <br><br>       **Plaintiffs**, <br><br> v. <br><br> Ruben Serna d.b.a. Serna Harvesting <br><br>       **Defendant**. | ) ) ) ) ) ) ) ) ) ) ) **COMPLAINT** ) ) ) ) ) ) ) ) ) ) ) |

## PRELIMINARY STATEMENT

1.      This is an action by nineteen migrant agricultural workers who were recruited from their homes in Mexico to perform labor for Defendant Ruben Serna in North Carolina harvesting blueberries, sweet potatoes, and other crops in 2015 and 2016. They bring this action for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA"), the North Carolina Wage and Hour Act, N.C.G.S. §§ 95-25.1, *et seq*. ("NCWHA"), and under North Carolina contract law.

2.      Defendant violated the FLSA by failing to pay Plaintiffs at least an average of the applicable minimum hourly wage for every compensable hour of labor performed in the first workweek.

3.      Defendant also violated the FLSA by failing to pay an average of the applicable minimum hourly wage for every compensable hour of labor performed in that they were not paid for all compensable hours worked, but were instead paid on a piece rate basis without regard for the number of hours worked.

4.      Defendant violated the NCWHA by failing to pay the promised adverse effect wage rate ("AEWR"), when that wage was due, for every hour that they worked in North Carolina, in violation of N.C. Gen. Stat. § 95-25.6, in that they were not paid for all compensable hours worked, but were instead paid on a piece rate basis without regard for the number of hours worked in a workweek.

5.      Defendant breached Plaintiffs' employment contracts by failing to pay the contractually promised wages for all hours worked, and by failing to reimburse pre-employment expenses incurred primarily for the benefit and convenience of Defendant.

6.      Plaintiffs seek damages, pre- and post-judgment interest, declaratory relief, costs, and reasonable attorneys' fees to redress these violations of the law.

## JURISDICTION

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1337 (interstate commerce), 28 U.S.C. § 1331 (federal question jurisdiction), 29 U.S.C. § 216(b) (FLSA), and 28 U.S.C. § 1367 (supplemental jurisdiction).

8.     This Court has supplemental jurisdiction over the claims arising under state law because these claims are so related to the federal claims that they form part of the same case or controversy.

9.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

### *Plaintiffs*

11.     Plaintiffs are citizens of Mexico who were admitted to the United States on a temporary basis pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) ("H-2A visa") to perform agricultural labor in North Carolina.

12.     At all times relevant to this action, the Plaintiffs were engaged in commerce or in the production of goods for commerce, or were employed in an enterprise engaged in commerce or in the production of goods for interstate commerce, within the meaning of the FLSA.

13.     Plaintiffs Ivan Ariel Baez-Quirazco, Jose Andres Barroso-Pacheco, Eliseo Cerna-Ramirez, Ignacio Clemente-Gutierrez, Martin Mario de los Santos del Rosario, Francisco Javier de los Santos Ramirez, Guilmain Evangelista-Alvarez, Adolfo Guerrero-Fernandez, Cesar Herrera-Velasquez, Miguel Lopez-Zarate, Fortunato Rayon-Flores, Flavio Rios-Santos, Juan Manuel Rodriguez-Magaña, Jorge Alberto Rojas-Castro, Felipe Ruiz-Rios, Sofronio Ruiz-Sanchez, David Zárate-Arroyo ("the 2015 Plaintiffs") were employed by Defendant in the 2015 season within the meaning of 29 U.S.C. §§ 203(e)(1) and 203(g), and under N.C. Gen. Stat. § 95-25.2(4), because Defendant suffered or permitted them to work.

14.     Plaintiffs Eliseo Cerna-Ramirez, Adolfo Guerrero-Fernandez, Miguel Lopez-Zarate, Juan Manuel Rodriguez-Magaña, and David Zárate are residents of Tangancícuaro, Michoacán, Mexico. They performed agricultural labor for Defendant in North Carolina between May through November 2015. They were recruited in Tangancícuaro, Michoacán for this employment by Defendant's authorized agent.

15.     Plaintiff Ignacio Clemente-Gutierrez is a resident of Tangancícuaro, Michoacán, Mexico. He performed agricultural labor for Defendant in North Carolina between May and November 2015 and between May and November 2016. He was recruited in Tangancícuaro, Michoacán for the 2015 employment by Defendant's authorized agent and recruited directly by Defendant to return in 2016.

16.     Plaintiffs Jose Andres Barroso-Pacheco, Cesar Herrera-Velasquez, Flavio Rios-Santos, Felipe Ruiz-Rios, and Sofronio Ruiz-Sanchez are residents of Oaxaca, Mexico. They performed agricultural labor for Defendant in North Carolina and Michigan between May and November 2015. They were recruited in Oaxaca for this employment by Defendant's authorized agent.

17.     Plaintiffs Ivan Ariel Baez-Quirazco, Martin Mario de los Santos del Rosario, Francisco Javier de los Santos Ramirez, Guilmain Evangelista-Alvarez, Fortunato Rayon-Flores, and Jorge Alberto Rojas-Castro are residents of Veracruz, Mexico. They performed agricultural labor for Defendant in North Carolina between May and November 2015. They were recruited in Veracruz for this employment by Defendant's authorized agent.

18.     Plaintiffs Ignacio Clemente-Gutierrez, Edray Moises Jimenez-Garcia and Misael Jimenez-Garcia ("the 2016 Plaintiffs") were employed by Defendant in the 2016 season within the meaning of 29 U.S.C. §§ 203(e)(1) and 203(g), and under N.C. Gen. Stat. § 95-25.2(4), because Defendant suffered or permitted them to work.

19.     Plaintiffs Edray Moises Jimenez-Garcia and Misael Jimenez-Garcia ("the Chiapanecan Plaintiffs") are residents of Comitán, Chiapas, Mexico. They performed agricultural labor for Defendant in North Carolina between May and November 2016. They were recruited in Chiapas for this employment by an agent of Defendant.

*Defendant*

20.     Defendant Ruben Serna is a farm labor contractor residing in Clinton, North Carolina. Defendant operates his farm labor contracting business under the name Serna Harvesting.  As a farm labor contractor, Defendant recruits, hires, transports, and furnishes migrant agricultural workers from various Mexican states to assist with the harvest of various crops in North Carolina and other states.

21.     Upon information and belief, Defendant is engaged in commerce or in the production of goods for interstate commerce with an annual gross volume of sales not less than $500,000.

## BACKGROUND OF THE H-2A PROGRAM

22.     The H-2A Program was created by 8 U.S.C. § 1188 and is implemented pursuant to the regulations found at 20 C.F.R. § 655.100 *et seq.* (2010). Under the Program, an agricultural employer may hire temporary foreign agricultural workers, commonly known as H-2A workers, if the U.S. DOL certifies that 1) there are insufficient available workers within the United States to perform the job and that 2) the employment of aliens will not adversely affect the wages and working conditions of similarly-situated U.S. workers. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1).

23.     Employers seeking to employ H-2A workers must file an Application for Temporary Employment Certification with Employment and Training Administration at the U.S. DOL. 20 C.F.R. §§ 655.121(a)(1), 655.130.

24.     The application must include a job offer, known as a Job Order, that complies with the requirements set forth in 20 C.F.R. §§ 655.122 and 653.501.

25.     Employers seeking to employ H-2A workers must agree to abide by the assurances contained in 20 C.F.R.§ 655.135, including the assurance that the employer will comply with all applicable Federal, State and local laws and regulations, including health and safety laws. 20 C.F.R. § 655.135(e).

26.     Federal regulations establish the minimum benefits, wages, and working conditions that must be offered by the petitioning employer in order to avoid adversely affecting similarly-situated U.S. workers. 20 C.F. R. § 655.122. Among these employment terms are the following:

27.     The employer will pay all workers at least the highest of the adverse effect wage rate ("AEWR"), the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage for every hour or portion thereof worked during a pay period. 20 C.F.R. §§ 653.501, 655.120(a), 655.122(l);

    (a) The employer will keep accurate and adequate records with respect to the workers' earnings and deductions from wages. 20 C.F.R. § 655.122(j);

    (b) For those employees paid on a piece rate basis, the worker's piece-rate earnings will be supplemented in any pay period in which they do not equal at least the amount the worker would have earned had he been paid hourly at the AEWR. 20 C.F.R. § 655.122(l)(2);

(c) The employer and his agents will not seek or receive payment of any kind from any H-2A worker for any activity related to obtaining H-2A labor certification, including monetary payments, wage concessions in the form of deductions, or other kickbacks. 20 C.F.R. §§ 655.135(j).

(d) The employer will specifically disclose all wage deductions not required by law, and no such deduction may include a profit for, or primarily benefit, the employer. 655.122(p); and

(e) The employer will provide free housing to workers which meets the minimum standards set forth at 20 C.F.R. §§654.404-654.417 or the OSHA standards set forth at 29 C.F.R. §1910.142, whichever are applicable. 20 C.F.R. §§654.401, 655.122(d).

28.     The terms and conditions of the Job Order constitute an employment contract between the employer and the H-2A workers which must be disclosed, in a language understood by the worker, no later than when a worker applies for their visa. 20 C.F.R. §655.122(q).

29.     The employer is required to cover the reasonable costs incurred by workers for inbound transportation and daily subsistence expenses. 20 C.F.R. §655.122(h)(1).

30.     Any inbound expenses a worker incurs primarily for the benefit of the employer must be reimbursed during the first pay period to the extent that such expenditures reduce the worker's net earnings below the AEWR for that pay period. *See Arriaga v. Florida-Pacific Farms, LLC*, 305 F.3d 1228 (11th Cir. 2002).

31.     Upon completion of the contract, an employer must return the worker, at the employer's expense, to the place from which he came to work for the employer unless the worker has been granted a visa extension for subsequent employment. 20 C.F.R. §655.122(h)(2).

32.     When an H-2A worker abandons employment, the H-2A employer must notify the Department of Homeland Security of the abandonment within 48 hours. 20 C.F.R. §655.122(n).

**H-2A Labor Contractors (H-2ALCs)**

33.     Farm Labor Contractors, or FLCs, who are registered with the U.S. DOL are permitted to apply for Temporary Employment Certification to employ H-2A workers if they meet all the requirements of the definition of an employer in 20 C.F.R. § 655.103(b) and comply with all of the assurances and obligations required of H-2A employers. 20 C.F.R. § 655.132. FLCs who receive H-2A labor certification are known as H-2A Labor Contractors, or H-2ALCs.

34.     H-2ALCs, who supply workers to fixed-site growers, are subject to additional requirements in applying for Temporary Employment Certification to which fixed-site grower applicants are not subject. *See* 20 C.F.R. § 655.132.

35.     Applications must include a copy of the Migrant and Seasonal Agricultural Worker Protection Act FLC Certificate of Registration and identify specific activities that the H-2ALC is authorized to perform, such as providing housing or transporting workers. § 655.132(b)(2);

36.     Applications must be limited to a single area of intended employment in which the fixed-site employer(s) to whom an H-2ALC is furnishing employees will be utilizing the employees. § 655.132(a);

37.     Applications must include the name and location of all fixed-site agricultural employers to whom the workers will be furnished and copies of all fully executed contracts with each fixed-site employer. § 655.132(b)(1), (b)(4);

38.     Where a fixed-site employer will provide housing or transportation, the contract with that fixed-site employer must include proof that the housing or transportation complies with the applicable standards and laws. § 655.132(b)(5); and

39.     For each worksite, H-2ALCs must provide a description of the crops and activities the workers will perform there, along with the expected start and end dates of the job or jobs. § 655.132(b)(1).

40.     H-2ALCs may not transfer workers to a fixed-site grower or other employer who is not disclosed on the Job Order without prior approval from the U.S. DOL. *See* 20 C.F.R. §655.122(o).

## 2015 FACTS

(Plaintiffs Baez-Quirazco, Barroso-Pacheco, Cerna-Ramirez, Clemente-Gutierrez, de los Santos del Rosario, de los Santos Ramirez, Evangelista-Alvarez, Guerrero-Fernandez, Herrera-Velasquez, Lopez-Zarate, Rayon-Flores, Rios-Santos, Rodriguez-Magaña, Rojas-Castro, Ruiz-Rios, Ruiz-Sanchez, and Zárate-Arroyo, "the 2015 Plaintiffs")

41.     Defendant applied for and was granted temporary labor certification through North Carolina Job Order Number 10359578 to employ 80 H-2A workers from May 18, 2015 through November 14, 2015 and to furnish them to various specified fixed site employers ("the 2015 Clearance Order"). A true and correct copy of the 2015 Clearance Order is attached hereto as Exhibit A.

42.     The 2015 Clearance Order provided a 35-hour workweek. Given the stated period of employment, the three-quarter guaranty required Defendant to offer at least 661.76 hours of employment under the contract.

43.     The 2015 Clearance Order incorporated an H-2ALC Itinerary listing three fixed-site agricultural employers with which Defendant had agreements. The fixed-site employers included (1) Thomas Melvin, with work hand harvesting blueberries from mid-May to late June 2015, (2) Cottle Farms, Inc., with work hand-harvesting blackberries and other vegetable crops from late June to late August 2015, and (3) Wayne Bailey, Inc., with work hand-harvesting sweet potatoes from late August to mid-November 2015.

44.     The Adverse Effect Wage Rate for North Carolina in 2015 was $10.32, effective on December 19, 2014. 79 Fed. Reg. 75839 (Dec. 19, 2014).

**Recruitment and Travel to North Carolina**

45.     In early 2015, Defendant's authorized agents recruited the 2015 Plaintiffs in the Mexican states of Michoacán, Oaxaca, and Veracruz to fill positions described in Defendant's Clearance Order.

46.     In the spring of 2015, at the direction of Defendant's agents, the 2015 Plaintiffs traveled at their own expense from their homes in Michoacán, Oaxaca, and Veracruz to Monterrey, Nuevo León for their H-2A interviews. The visa application process took several days, during which each of the 2015 Plaintiffs incurred, at their own expense, lodging expenses in Monterrey.

47.     Each 2015 Plaintiff paid, at his own expense, a visa application fee to the U.S. State Department, as required to obtain the H-2A visa.

48.     The 2015 Plaintiffs paid, at personal expense, for a hotel room in Monterrey for each night necessary to complete the visa interview process.

49.     Upon receiving approval for their visa applications, the 2015 Plaintiffs then traveled by bus, at their own expense, to the U.S./Mexico border, where each of them paid from their own personal funds a six dollar ($6.00) fee for issuance of an immigration arrival/departure document commonly referred to as Form I-94.

50.     Upon entering the United States, the 2015 Plaintiffs arranged their own transportation to North Carolina at their own expense.

51.     During the several days that passed between when the 2015 Plaintiffs left their homes and when they arrived in North Carolina, each incurred costs for meals and incidentals.

52.     The 2015 minimum reimbursement for daily travel subsistence rate was $11.86, effective February 23, 2015. 80 Fed. Reg. 35 (Feb. 23, 2015).

**Plaintiffs' 2015 Employment with Defendant**

53.     The 2015 Plaintiffs arrived in North Carolina in or around mid-May 2015.

54.     Defendant housed the 2015 Plaintiffs and other workers in housing provided by Thomas Melvin, a blueberry grower.

55.     The 2015 Plaintiffs began work in blueberries in or around mid-May 2015.

56.     Defendant did not reimburse the 2015 Plaintiffs during their first workweek for the costs they incurred for transportation between their respective homes and the jobsite, their visa costs, the I-94 fee, lodging expenses in Monterrey, or daily subsistence costs.

57.     Throughout their work harvesting blueberries with Defendant's crew, Defendant compensated the 2015 Plaintiffs on a piece rate basis without regard for the number of compensable hours worked.

58.     The 2015 Plaintiffs' weekly earnings for piece-rate work in blueberries fell below the hourly compensation required to meet the adverse effect wage rate of $10.32 per hour. Defendant failed to supplement the 2015 Plaintiffs' piece rate earnings so that their weekly earnings equaled the adverse effect wage rate given the compensable hours of labor performed.

59.     Defendant's practice of compensating workers using the piece rate without regard to the number of compensable hours worked at times caused the 2015 Plaintiffs' wages to fall below the federal minimum wage.

60.     Defendant underreported the actual number of hours worked on the 2015 Plaintiffs' paystubs, and paid them significantly less than they were owed based on compensable hours worked.

61.     For example, during the workweek ending on June 17, 2015, Defendant paid Plaintiff Evangelista-Alvarez gross wages of $305.00. His pay records claim that he worked 28.26 hours and picked 122 buckets of blueberries.

62.     During the workweek ending June 17, 2015, Plaintiff Evangelista-Alvarez actually worked 61.91 hours.

63.     The 2015 Job Order and applicable law required that 61.91 work hours be compensated at no less than $10.32 per hour, the applicable AEWR, which means Defendant should have paid Plaintiff Evangelista-Alvarez no less than $638.91. Defendant thus underpaid Plaintiff Evangelista-Alvarez' contract wages by $333.91 for that workweek.

64.     The applicable FLSA minimum wage in June of 2015 was $7.25 per hour. Defendant failed to pay the applicable FLSA minimum wage for the workweek ending on June 17, 2015 by failing to pay Plaintiff Evangelista-Alvarez at least $448.85 for 61.91 hours of work.

65.     For example, Defendant paid Plaintiff Miguel Lopez-Zarate gross wages of $450 for the workweek ending on May 27, 2015. During that workweek, he actually worked 77.33 hours.

66.     Defendant should have paid Plaintiff Lopez-Zarate $798.05 based on the 2015 AEWR for 77.33 hours of compensable labor during the workweek ending on May 27, 2015.

67.     Defendant violated the FLSA minimum wage requirements for the workweek ending on May 27, 2015 by failing to pay Plaintiff Lopez-Zarate at least $560.64 for 77.33 hours of compensable labor at the applicable federal minimum wage of $7.25 per hour.

68.     Defendant failed to provide the 2015 Plaintiffs each payday with a written statement showing the beginning and end dates of the pay period.

69.     Shortly after the 2015 Plaintiffs' arrival to North Carolina, Defendant provided to each worker, including each 2015 Plaintiff, a check providing a sum of money that was purportedly to

reimburse some or all of the incoming travel expenses incurred by the 2015 Plaintiffs for the benefit of the employer. However, Defendant immediately ordered the workers to endorse the checks then give the checks back to him before they could cash them. The 2015 Plaintiffs never received the check proceeds free and clear.

70.     Defendant then ordered the 2015 Plaintiffs and other workers to sign a document acknowledging receipt of the travel expense reimbursement. Even though the 2015 Plaintiffs had not actually received money to cover incoming travel expenses, they signed out of the fear that they would be fired from their employment with Defendant if they did not comply.

71.     Plaintiffs Cerna-Ramirez, Clemente-Gutierrez, Guerrero-Fernandez, Lopez-Zarate, Rodriguez-Magaña, and Zarate-Arroyo eventually got their incoming travel expense reimbursement, but many weeks late such that payment was untimely. The remaining 2015 Plaintiffs never received their reimbursement.

**Defendant Fails to Provide Contract Work**

72.     The 2015 Plaintiffs' work in blueberries ended as scheduled around the end of June.

73.     According to the 2015 Clearance Order, the 2015 Plaintiffs were to be provided work on Cottle Farms beginning in July, 2015.

74.     However, Defendant informed the 2015 Plaintiffs that the work with the next grower on their contract had fallen through and that Defendant would not provide them with work in North Carolina until the end of August, when the sweet potato work to be completed on the farm of Wayne Bailey, Inc. was scheduled to begin in mid-August 2015.

75.     Defendant informed the 2015 Plaintiffs and other workers that he was going to Michigan at that time.

76.     Defendant informed the 2015 Plaintiffs and other workers that they could not remain in their current housing unless they began paying rent.

77.     Defendant stated that he wanted workers to come with him to Michigan. Defendant warned the workers not to return to Mexico, however, purportedly because he needed their labor later in the season for the third site grower on the 2015 Clearance Order.

78.     In July 2015, Defendant required all workers including the 2015 Plaintiffs to sign a "Voluntary Leave of Absence" form which claimed that they were leaving their job for personal reasons but would return on August 30, 2015. The form stated that the absence would be counted towards hours offered for the purpose of computing the three-quarter guaranty.

79.     Many workers, fearing that Defendant would deny them future employment if they didn't comply, signed the Voluntary Leave of Absence form.

80.     Beginning in mid-September, Defendant provided workers with additional work in North Carolina that was listed in the 2015 Clearance Order. Plaintiffs Baez-Quirazco, Barroso-Pacheco, Cerna-Ramirez, Clemente-Gutierrez, de los Santos del Rosario, de los Santos Ramirez, Guilmain Evangelista-Alvarez, Guerrero-Fernandez, Lopez-Zarate, Flavio Rios-Santos, Rodriguez-Magaña, Rojas-Castro, Ruiz-Rios, Ruiz-Sanchez, and Zárate-Arroyo remained working for Defendant until the end of the contract.

81.     The 2015 Plaintiffs who stayed until the end of the contract were given $240.00 by Defendant to cover the cost of their return transportation.

82.     The actual cost of their return transportation varied but exceeded this amount for all 2015 Plaintiffs.

83.     For example, Plaintiff Ivan Ariel Baez-Quirazco spent approximately $360.00 on his bus ticket home and for food along the way.

84.     Defendant failed to offer at least three-quarters of the hours promised under the 2015 Job Order. Defendant failed to supplement the 2015 Plaintiffs' wages so that wages received by the 2015 Plaintiffs were at least the wages owed for 661.76 compensable hours worked under the 2015 Job Order.

**Defendant Fails to Compensate for All Hours Worked**

85.     Defendant failed to compensate workers for travel time, and for time spent working as drivers and for vehicle maintenance that was to the benefit of Defendant.

86.     Beginning at or around the end of the 2015 blueberry season, Plaintiff Ignacio Clemente-Gutierrez, in addition to crop work, began to perform driving and vehicle care duties.

87.     Defendant paid Plaintiff Clemente-Gutierrez a total of $200.00 for bus driving and vehicle care in 2015.

88.     Plaintiff Clemente-Gutierrez performed vehicle care related duties for approximately 30 minutes each morning, Monday through Saturday.

89.     Defendant did not properly compensate Plaintiff Clemente-Gutierrez for vehicle preparation and maintenance time completed for the benefit of Defendant.

90.     Each Saturday, Plaintiff Clemente-Gutierrez and several other workers washed and cleaned the bus, a process which took approximately one hour.

91.     Defendant did not properly compensate Plaintiff Clemente-Gutierrez for this vehicle cleaning time.

92.     Each Sunday, Plaintiff Clemente-Gutierrez drove the bus to provide workers transportation to retrieve their week's pay in the form of checks, cards, or cash from Defendant's home, also to a check cashing establishment or ATM machine, also to Wal-Mart in Clinton,

North Carolina to make weekly purchases of food and other items, and finally back to the labor camp. These Sunday outings lasted several hours each week.

93.     Defendant did not properly compensate Plaintiff Clemente-Gutierrez for transporting workers on Sundays.

94.     Depending upon the crop, worksites could be less than ten (10) minutes away from the labor camp, or up to an hour away.

95.     Each working day throughout the season, Plaintiff Clemente-Gutierrez drove the bus to the worksite and back to the labor camp at the end of the day.

96.     Defendant did not properly compensate Plaintiff Clemente-Gutierrez for this time transporting workers.

97.     During the sweet potato season, Plaintiff Clemente-Gutierrez drove a farm truck to haul the sweet potatoes. He secured produce containers to the vehicle and delivered them to the packing house.

98.     Defendant paid Plaintiff Clemente-Gutierrez for this truck work based on how much produce was harvested by the harvesters.

## 2016 FACTS

(Plaintiffs Ignacio Clemente-Gutierrez, Edray Moises Jimenez-Garcia and Misael Jimenez-Garcia)

99.     Defendant applied for and was granted temporary labor certification through North Carolina Job Order Number 10484147 to employ 99 H-2A workers from May 13, 2016 through November 15, 2016 and to furnish them to various fixed site employers to perform agricultural work in crops including blueberries, watermelons, vegetables, sweet potatoes, and tobacco ("the 2016 Clearance Order"). A true and correct copy of the 2016 Clearance Order is attached hereto as Exhibit B.

100.    The 2016 Clearance Order incorporated an H-2ALC Itinerary listing nine fixed-site agricultural employers with which Defendant had agreements.

101.    The Adverse Effect Wage Rate for North Carolina in 2016 was $10.72, effective on December 22, 2015.  80 Fed. Reg. 79614 (Dec. 22, 2015).

**Recruitment and Travel to North Carolina**

102.    Defendant's authorized agents recruited Plaintiffs Edray Moises Jimenez-Garcia and Misael Jimenez-Garcia ("Chiapanecan Plaintiffs") from their small hometown of Comitán, Chiapas, Mexico to work to fill positions for Defendant described in the 2016 Clearance Order as agricultural laborers in North Carolina.

103.    One of Defendant's recruiting agents required that, in order to obtain employment with Defendant, each of the Chiapanecan Plaintiffs must pay a recruitment fee of $150.00 to Defendant upon arrival to North Carolina.

104.     Defendant's authorized agent told the Chiapanecan Plaintiffs that they would be working in blueberries, tobacco, chili peppers, and sweet potatoes, and the approximate times of the season each crop was produced.

105.    Defendant's authorized agent also informed the Chiapanecan Plaintiffs that they would be required to go to the city of Tuxla Gutierrez to sign a contract to accept positions described in the 2016 Clearance Order with an associate identified as "an attorney".

106.    In or around the middle of April 2016, Defendant's authorized agent contacted the Chiapanecan Plaintiffs and helped them fax their documents to the attorney in Tuxla Gutierrez to apply for their H-2A visas.

107.    In or around late April 2016, the Chiapanecan Plaintiffs went to Tuxla Gutierrez and met with the attorney, signed the 2016 Clearance Order, and paid for their visas.

108.    The Chiapanecan Plaintiffs each paid more than $190.00 for their visas, which were for the benefit of Defendant.

109.    The Chiapanecan Plaintiffs each paid more than $29.00 for their travel costs to and from Tuxla Gutierrez, which was for the benefit of Defendant.

110.    The attorney summarized the job terms and the rights associated with the job to the Chiapanecan Plaintiffs without reading the 2016 Clearance Order to them verbatim.

111.    In or around the middle of May 2016, at the direction of Defendant's agents, the Chiapanecan Plaintiffs took a bus from Comitán, Chiapas to Monterrey, Nuevo León to finalize their approval for H-2A visas.

112.    The Chiapanecan Plaintiffs each paid travel expenses from Comitán to Monterrey, including transportation and food, totaling more than $215.00. These costs were for the benefit of Defendant.

113.    The Chiapanecan Plaintiffs each paid more than $120.00 for the cost of subsistence while in Monterrey. These costs were for the benefit of Defendant.

114.    Defendant recruited Plaintiff Clemente-Gutierrez from his small hometown of Tangancícuaro, Michoacán, Mexico to return work for Defendant to fill a position described in the 2016 Clearance Order as an agricultural laborer in North Carolina.

115.    Defendant informed Plaintiff Clemente-Gutierrez that he would be invited to come work under the 2016 Clearance Order if he agreed to forego reimbursement for expenses associated with coming to work in North Carolina for the benefit of Defendant, including the costs of his visa, food, hotel, and transportation.

116.    Plaintiff Clemente-Gutierrez stated that he wanted to come to work for Defendant.

117.    Defendant offered him a job under the 2016 Clearance Order.

118.    Plaintiff Clemente-Gutierrez came to Monterrey from Tangancícuaro in May of 2016 for visa processing.

119.    Plaintiff Clemente-Gutierrez spent in excess of $80.00 for costs associated with coming to Monterrey for visa processing.

120.    Plaintiff Clemente-Gutierrez signed the 2016 Clearance Order.

121.    The Chiapanecan Plaintiffs and Plaintiff Clemente-Gutierrez (collectively the "2016 Plaintiffs") each paid more than $120.00 for the cost of subsistence while in Monterrey. These costs were for the benefit of Defendant.

122.    After final approval of their visas in Monterrey, the 2016 Plaintiffs took a bus to North Carolina.

123.    The 2016 Plaintiffs each paid travel expenses from Monterrey to North Carolina, including transportation and food, totaling more than $280.00. These costs were for the benefit of Defendant.

124.    The 2016 Plaintiffs arrived in North Carolina on or around May 22, 2016.

125.    In 2016, the minimum reimbursement for the daily costs of meals and incidentals was $12.09, effective on February 26, 2016. 81 Fed. Reg. 38 (Feb. 26, 2016).

126.    Defendant never reimbursed the 2016 Plaintiffs for their travel or visa expenses. This brought their first week wages below the federal minimum wage of $7.25 per compensable hour of work.

127.    In North Carolina, Defendant's authorized agent, Humberto, who had recruited the Chiapanecan Plaintiffs from their homes in Mexico, was the 2016 Plaintiffs' supervisor.

128.    Soon after the 2016 Plaintiffs' arrival, Defendant's agent Humberto demanded that each of the Chiapanecan Plaintiffs pay $250.00 as a recruitment fee.

129.    Upon information and belief, Defendant authorized this fee demand.

130.    The Chiapanecan Plaintiffs did not pay the agent the recruitment fee at that time.

131.    However, Humberto continued to apply pressure on each of the Chiapanecan Plaintiffs to pay $250.00 as a recruitment fee.

132.    Before the end of the 2016 contract season, the Chiapanecan Plaintiffs each paid $250.00 to Humberto for the benefit of Defendant.

133.    Upon information and belief, near the end of the season, Defendant gave checks written out to workers, including the Chiapanecan Plaintiffs, to Humberto with instructions to have the workers endorse the checks then immediately return the endorsed checks to Defendant.

134.    Humberto presented checks to the workers, including the Chiapanecan Plaintiffs, and demanded that, in order to get on the list to return to work for Defendant the following year, each worker would need to sign the back of the check.

135.    The Chiapanecan Plaintiffs never saw the front of the checks.

136.    Defendant's agent, Humberto, stated that the amount of each of these checks was $250.00.

137.    The Chiapanecan Plaintiffs stated that they did not desire to endorse the checks, but Humberto threatened them into signing the checks.

138.    Each of the Chiapanecan Plaintiffs signed the back of the check.

139.    Throughout the check signing process and the threats, Defendant was physically present and aware of the proceedings.

140.    The Chiapanecan Plaintiffs never received the proceeds from these checks.

141.    The 2016 Plaintiffs fulfilled their obligation to work the full season of work offered under the 2016 Clearance Order.

142.     The 2016 Plaintiffs incurred expenses returning to their homes in Mexico when the season ended.

143.     Defendant never paid the 2016 Plaintiffs funds to cover any of their return travel expenses.

144.     Defendant held the Chiapanecan Plaintiffs' Social Security cards the entire season.

**2016 Housing**

145.     Defendant provided the 2016 Plaintiffs with housing in a barracks-style facility upon their arrival to North Carolina.

146.     On or about June 22, 2016, acting on the authority of Defendant, Defendant's agent demanded and received $80.00 in cash as rent from each of the Chiapanecan Plaintiffs.

147.     Defendant's agent demanded and received $80.00 in cash as rent from each of the 2016 Chiapanecan Plaintiffs on or about the twenty-second (22nd) day of each month throughout the remainder of the 2016 contract season, through and including October 22, 2016.

148.     The beds in the Chiapanecan Plaintiffs' housing facility were infested with cimex lectularius, commonly known as bed bugs.

149.     The Chiapanecan Plaintiffs issued multiple complaints about the bed bugs to their supervisor, but Defendant never attempted to resolve the infestation. The beds remained infested with bed bugs throughout the 2016 contract season.

150.     Defendant did not provide toilet paper at any time during the contract season, so the 2016 Plaintiffs purchased toilet paper at their own expense.

151.     In October 2016, Hurricane Matthew struck North Carolina and the housing facility lost power for approximately two (2) weeks.

152.    During the power outage, there was no running water at the housing facility for cooking or cleaning, and the showers and toilets were non-functional.

153.    The toilets were not fully functional for a total of three to four (3-4) weeks following the hurricane.

154.    Defendant did not provide substitute housing, portable toilets, or shovels, so the workers living in the housing facility, including the 2016 Plaintiffs, were forced to defecate and urinate in a wooded area around the housing facility.

**Plaintiffs' 2016 Employment with Defendant**

155.    The 2016 Plaintiffs performed agricultural labor in fields ("worksites") for Defendant throughout the 2016 contract season.

156.    Throughout the entire 2016 season, Plaintiff Clemente-Gutierrez, in addition to crop work, performed the same driving and vehicle care duties described in paragraphs 85 through 98, including transporting workers and vehicle maintenance and cleaning.

157.    Defendant paid Plaintiff Clemente-Gutierrez a total of only $300.00 for bus driving and vehicle care in 2016. This pay did not properly compensate Plaintiff Clemente-Gutierrez for these driving and vehicle care duties based on the number of compensable hours worked.

158.    During the 2016 sweet potato season, Plaintiff Clemente-Gutierrez drove a farm truck to haul the sweet potatoes. He secured produce containers to the vehicle and delivered them to the packing house.

159.    Defendant paid Plaintiff Clemente-Gutierrez for this truck work based on how much produce was harvested by the harvesters.

160.    Most days throughout the season, the 2016 Plaintiffs worked at two to three (2-3) different worksites, each of which was thirty to forty (30-40) minutes, and up to an hour, apart.

161.    Each working day throughout the season, Plaintiff Clemente-Gutierrez drove the bus to the first worksite, between worksites, and back to the labor camp at the end of the day. Defendant did not compensate the 2016 Plaintiffs for the time traveling between worksites.

162.    Many of the worksites lacked toilets.

163.    When Defendant provided toilets, toilet paper was generally not provided.

164.    When Defendant did not provide toilets, workers, including the 2016 Plaintiffs, had to defecate and urinate outdoors near the worksite.

165.    When Defendant did not provide toilets, hand washing facilities were also not provided.

166.    Defendant provided drinking water at the worksites only sporadically throughout the 2016 contract season, including during the months of July and August when outdoor temperatures regularly exceeded 100 degrees Fahrenheit (100°F). Workers including 2016 Plaintiffs as a consequence often went without drinking water.

167.    When Defendant provided drinking water, he did not provide cups, so workers were required to drink directly from the water cooler.

168.    Around the time of the hurricane, the drinking water, when provided by Defendant, contained silt.

**2017 FACTS**

169.    In early 2017, Defendant's recruiting agent, Humberto, who had supervised them in North Carolina, informed the Chiapanecan Plaintiffs that, as a prerequisite to obtaining work with Defendant for the 2017 growing season, they would first need to pay him over $1000.00 up front and would later be required to pay additional $1,000.00 directly to Defendant (2017 recruitment fee).

170.    In 2017, the Chiapanecan Plaintiffs did not pay the requested 2017 recruitment fee as requested by Defendant's agent, Humberto.

171.    As a consequence, the Chiapanecan Plaintiffs were not offered work with Defendant in 2017.

### FIRST CLAIM FOR RELIEF

#### Fair Labor Standards Act

172.    Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 171 above by reference.

173.    Plaintiffs bring this claim for Defendant's violations of the minimum wage provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq*.

174.    Plaintiffs have consented in writing to bring this FLSA action. Their written consents are attached as Exhibits C through U.

175.    Defendant violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206(a), by failing to pay Plaintiffs at least the federal minimum wage of $7.25 for every compensable hour of labor performed in each workweek during which they were employed.

176.    The violations of the minimum wage provisions of the FLSA as set out in paragraphs 46 through 56, 69 through 71, and 103 through 143 resulted in part from Defendant's failure to reimburse Plaintiffs during their first week of employment for expenses incurred primarily for the benefit of Defendant, including recruitment fees, Plaintiffs' lodging expenses near the U.S. Consulate, visa costs, issuance of Form I-94, and the full cost of Plaintiffs' travel from their homes to Defendant's jobsite. When these expenses are calculated as deductions from first week's pay, as required by law, they cause Plaintiff's first week's earnings to be less than the FLSA minimum wage.

177. Defendant failed to pay what would be considered wages under the FLSA by handing Plaintiffs a check but ordering them to sign the check back to Defendant. These wages were not paid free and clear as required by the FLSA. 29 C.F.R. §531.35.

178. The violations of the minimum wage provisions of the FLSA as set out in paragraphs 57 through 68, 85 through 98, and 156 through 161 resulted in part from Defendant's failure during various weeks to supplement Plaintiffs' piece-rate earnings so that they equaled or exceeded the FLSA minimum wage for work performed in each workweek, and by failing to compensate Plaintiffs for all hours worked.

179. Upon information and belief, Defendant knew that he was required to pay Plaintiff at least minimum wage for each hour worked during a work week. As such, Defendant's failure to pay the Plaintiffs the minimum wage was willful within the meaning of 29 U.S.C. § 255.

180. As a consequence of Defendant's violation of their rights under the FLSA, Plaintiffs seek unpaid minimum wages, plus an equal amount in liquidated damages, and court costs, pursuant to 29 U.S.C. § 216(b).

<u>**SECOND CLAIM FOR RELIEF**</u>

**North Carolina Wage and Hour Act**

181. Plaintiffs incorporate each of the allegations contained in paragraphs 1 through 171 above by reference.

182. This claim arises against Defendant under the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.22.

183. As detailed in paragraphs 57 through 68, 85 through 98, and 156 through 161 above, Defendant failed to pay the Adverse Effect Wage Rate of $10.32 per hour in 2015 and $10.72 per hour in 2016 when due as promised in the Clearance Orders by failing to pay for all

compensable hours worked, by paying wages based on a piece rate without regard to the number of hours worked, and by failing to reimburse expenses incurred for the benefit of the employer, bringing the wages received below the promised wage in violation of N.C. Gen. Stat. § 95-25.6.

184.    As a result, Plaintiffs suffered damages in the form of unpaid wages and liquidated damages that may be recovered from Defendant, under N.C.G.S. §§ 95-25.22(a) and 95-25.22(a1).

### THIRD CLAIM FOR RELIEF

**Breach of Contract**

185.    Plaintiff incorporates each of the allegations contained in paragraphs 1 through 171 above by reference.

186.    This claim is brought by Plaintiffs for damages resulting from Defendant's breach of the employment contracts, as embodied in the 2015 Clearance Order and the 2016 Clearance Order, attached as, respectively, Exhibit A and Exhibit B.

187.    The terms and conditions of employment contained in the various clearance orders constituted the employment contracts between Defendant and the H-2A workers, including Plaintiffs, the terms of which were supplied by federal regulations at 20 C.F.R. §§ 655.121, 655.122, and 655.135.

188.    Defendant Serna offered employment on the terms and conditions set out in 2015 and 2016 job orders, and temporary labor certification applications.

189.    Plaintiffs accepted Defendant's offer.

190.    Defendant breached his employment contracts with Plaintiffs by providing terms and conditions of employment that were materially different from those in the clearance orders.

191.     Defendant breached his employment contracts with Plaintiffs by failing to pay Plaintiffs the promised minimum hourly wage of $10.32 in 2015 and $10.72 in 2016.

192.     Defendant breached his employment contracts with Plaintiffs by failing to pay Plaintiffs at least the applicable federal minimum wage for each compensable hour of work in a workweek.

193.     Defendant breached his employment contracts with Plaintiffs by failing to timely provide reimbursements for inbound transportation expenses.

194.     Defendant breached his employment contracts with Plaintiffs by failing to accurately record hours worked.

195.     Defendant breached his employment contracts with Plaintiffs by providing work in crops not listed on the applicable clearance order.

196.     Defendant breached his employment contracts with Plaintiffs by failing to pay return transportation expenses for Plaintiffs who worked until the end of the contract period.

197.     Defendant breached his employment contract with the 2015 Plaintiffs by failing to pay three quarter guaranty wages.

198.     Defendant breached his employment contracts with the Plaintiffs by charging a recruitment fee.

199.     Defendant breached his employment contract with the Plaintiffs by violating 20 C.F.R. sec. 655.135(h).

200.     Defendant's breach of his employment contract with Plaintiffs caused substantial injuries.

201.     Defendant's breach of his employment contract with Plaintiffs caused substantial injuries.

202.     Defendant is liable to Plaintiffs for the damages that arose naturally and according to the usual course of things from Defendant's breach, as provided by federal common law and/or

North Carolina common law, including unpaid wages, damages arising from the delay, and prejudgment interest.

## JURY DEMAND

203.    Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this court enter an order:

1. Finding that this Court has jurisdiction over Plaintiffs' claims;

2. Enter a declaratory judgment that Defendant violated Plaintiffs' rights under the FLSA as set forth in the First Claim for Relief;

3. Enter a declaratory judgment that Defendant violated Plaintiffs' rights under the NCWHA as set forth in the Second Claim for Relief;

4. Enter a declaratory judgment that Defendant violated Plaintiffs' rights under the common law of contracts as set forth in the Third Claim for Relief;

5. Enjoining Defendant from further violations of the FLSA, the NCWHA, and their rights under their employment contracts.

6. Awarding each Plaintiff his respective unpaid minimum wages and an equal amount in liquidated damages;

7. Awarding Plaintiffs their actual damages for Defendant's breach of the employment contracts, as embodied in the clearance orders as set forth in the Third Claim for Relief

8. Awarding the Plaintiffs the costs of this action;

9. Awarding the Plaintiffs a reasonable attorney's fees of this action pursuant to the FLSA, 29 U.SC. sec. 216; and

10. Granting such relief as this Court deems just and appropriate.

This the 11th day of May, 2017.

Respectfully submitted,

/s/ Caroline S. DiMaio
Caroline S. DiMaio Bar No: 40077
*Attorney for Plaintiffs*
Legal Aid of North Carolina
224 South Dawson Street
Raleigh, North Carolina 27601
Telephone: (919) 856-2180
Fax: (919) 714-6661
E-mail: CarolineD@legalaidnc.org

/s/ Lori J. Johnson
Lori J. Johnson Bar No: 24227
*Attorney for Plaintiffs*
Legal Aid of North Carolina
224 South Dawson Street
Raleigh, North Carolina 27601
Telephone: (919) 856-2180
Fax: (919) 714-6587
Email: LoriE@legalaidnc.org